Lucas Markowitz, Esq.
**BRACH EICHLER L.L.C.**
101 Eisenhower Parkway
Roseland, New Jersey 07068-1067
(973) 228-5700
(973) 228-7852 (fax)
lmarkowitz@bracheichler.com
*Attorneys for Plaintiff, Jerich USA, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JERICH USA, INC. | Civil Case No.: |
| Plaintiff, | |
| v. | |
| | **(Document Electronically Filed)** |
| CENTERPOINT PROPERTIES TRUST, INC. | |
| Defendant. | **COMPLAINT** |

Plaintiff, Jerich USA, LLC, ("Plaintiff" or "Tenant" or "Jerich") by and through its undersigned counsel, Brach Eichler, LLC, hereby brings the following Complaint against Defendant, Centerpoint Properties Trust, Inc. ("CenterPoint" or "Landlord") and in support thereof, avers as follows:

### NATURE OF THE ACTION

1.      This case is about a landlord shaking down its tenant for an exorbitant upgraded replacement to the parking area at the building it owns at 320 Telfair Road, Savannah, Georgia 31415 (the "Property") — a capital improvement. But despite owning the Property, CenterPoint does not want to pay for its extravagant capital improvement itself. Rather, CenterPoint wants its tenant, Jerich, to pay for it. The only problem for CenterPoint is that its lease does not obligate Jerich to pay for capital improvements, it only obligates Jerich to pay for basic maintenance.

2.       Jerich leases approximately 136,458 square feet of space at the Property from Landlord, constituting approximately 48% of the total square footage of the warehouse on the Property, under a written Lease Agreement dated July 16, 2014 (the "Lease"). Attached hereto as **Exhibit A** is a true and correct copy of the Lease.

3.       CenterPoint has estimated that its proposed replacement and upgrade of the existing parking areas and truck court ("Truck Court") will cost $546,956.00. In 2017, however, Jerich was only responsible for $275.00 in parking lot *maintenance*. This juxtaposition makes clear that CenterPoint proposed a capital improvement, not a maintenance item, and Jerich is not responsible for it. This is a shakedown, pure and simple.

4.       A dispute has now arisen between the parties as to whether Jerich is responsible to replace and upgrade its landlord's Truck Court, or whether CenterPoint, the landlord and owner, is responsible for its own capital improvements.

5.       Therefore, Jerich brings this action for declaratory judgment in connection with CenterPoint's demand for payment of the pro rata cost to replace the truck courts and parking areas within the Property.

6.       Jerich requests that this matter be expedited on the Court's calendar as permitted by Rule 57 of the Federal Rules of Civil Procedure.

## PARTIES

7.       Jerich is a New Jersey corporation with a principal place of business at 1 Industrial Road, Suite 102, Dayton, New Jersey 08810.

8.       CenterPoint is a corporation organized under the laws of the State of Illinois, with a principal place of business at 1808 Swift Drive, Oak Brook, IL  60523-1573.

9.       CenterPoint is a real estate investment trust that owns hundreds of commercial investment properties across the United States, including a number of properties in the State of

New Jersey.  Upon information and belief, it maintains offices in Saddle Brook, New Jersey, tasked with property management of all of its real estate holdings in the eastern region of the United States, including its Georgia properties.

## JURISDICTION

10.     This United States District Court for the District of New Jersey (the "Court") has subject matter jurisdiction over this action based upon diversity of citizenship pursuant to 28 U.S.C. § 1332, because:

> (a)      Jerich is a citizen of the State of New Jersey;
>
> (b)      CenterPoint is a citizen of the State of Illinois; and
>
> (c)      the amount in controversy exceeds $75,000.00, exclusive of interests and

costs.

11.     This Court has personal jurisdiction over CenterPoint because it transacts the business underlying this lawsuit in the State of New Jersey, and/or caused injury within the State of New Jersey arising out of that business.

12.     The Lease itself was between CenterPoint's predecessor in interest, McDonald Georgia Commerce Center 400, LLC ("MGCC" or the "Original Landlord") (a Georgia limited liability company) and "Jerich USA, Inc. a New Jersey Corporation." In other words, when CenterPoint bought the Property from MGCC, it knew it was leasing to a New Jersey corporation.

13.     Further, Jerich's point of contact with CenterPoint, its landlord, was always in CenterPoint's New Jersey office.

14.     In fact, CenterPoint's initial demand to Jerich to replace and upgrade the Truck Court came from CenterPoint's employee, Harold Campbell, who was based in New Jersey.

15.     Further, upon information and belief, Defendant regularly conducts and transacts business in New Jersey such that it is "present" in New Jersey for purposes of personal jurisdiction,

and is registered as a foreign corporation with the State of New Jersey, Department of Treasury, Division of Revenue and Enterprise Services.

16.     According to CenterPoint's website, they own or operate at least twenty-one properties in New Jersey totaling almost 4.2 million square feet.

17.     As such, Defendant has certain minimum contacts with the State of New Jersey such that the maintenance of the suit here does not offend traditional notions of fair play and substantial justice.

## VENUE

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

**A.     The Property**

19.     Built in 2007, the Property consists of a 279,126 square foot warehouse, and a Truck Court.

20.     Originally, the building sat vacant for approximately two years, until JIT Warehousing and Logistics, LLC ("JIT") leased about half of the warehouse from CenterPoint's predecessor in interest, MGCC.

21.     Upon information and belief JIT is a local Savannah, Georgia based warehousing and logistics company—a much smaller operation than Jerich.

22.     Jerich on the other hand, is part of an international logistics company with locations all over Europe and all across the United States.

23.     JIT currently occupies 142,668 square feet of the warehouse, or almost 52%.

### B.     The Lease

24.     On July 16, 2014, seven years after the Property was built, Plaintiff entered into the Lease with MGCC for approximately 136,458 square feet of space at the Property, constituting approximately 48% of the total square footage of the Property. For that, Jerich pays CenterPoint approximately $45,586.00 per month.

25.     Upon information and belief, at some point on or after Plaintiff entered the Lease, Defendant acquired the Property from the Original Landlord and became Plaintiff's new Landlord under the Lease.

26.     The Lease expressly defines the "Premises" as:

> …certain premises (Suite 100) being approximately 136,458 square feet of space (the "Premises") shown on Exhibit "B", within the building known as Building 400 at Georgia Commerce Center Two (the "Building"), located at 320 Telfair Road, Savannah, Chatham County, Georgia 31415, described on Exhibit "A" attached hereto and incorporated herein by reference, together with all rights, privileges, easements, and appurtenances belonging to or in any way pertaining to said Premises (hereinafter collectively the "Property").

27.     The Lease, at Paragraph 8, provides that:

> "Tenant shall at its own cost and expense keep and maintain all parts of the **Premises** (except those for which Landlord is expressly responsible under the terms of this Lease) in good condition, promptly making all necessary repairs and **replacements**…".
>
> (**emphasis added**).

28.     Thus, because the Lease limits the Tenant's obligation to make **replacements** to the "Premises," as defined in the Lease to mean the 136,458 square feet of space that it rents from Landlord, the Lease does not extend Tenant's obligations to make **replacements** to the common areas outside of the walls of the leased space.

29.     Instead, the Tenant's common area maintenance obligations ("CAM") are set forth in Paragraph 9 of the Lease, which provides that:

> Tenant shall pay to Landlord as additional rent a common area operating and maintenance equal to Tenant's 'proportionate share' (as defined in subparagraph 6.A. herein) the cost and expense for the operation and maintenance of the common areas of the building and part in which the Premises are located, including but not limited to, the mowing of the grass, care of shrubs, general landscaping, common sewage line plumbing, maintenance of the building, parking areas, entrances, driveways and management thereof.

30.    In turn, Paragraph 6.A. of the Lease provides that "proportionate share"

> . . . shall mean a fraction, the numerator of which is the gross square footage contained in the Premises and the denominator of which is the gross square footage contained in the building . . .

31.    With that in mind, since Jerich occupies 136,458 square feet and JIT occupies the other 142,668 square feet of the "building," Jerich is currently responsible for 48% of CAM and the other tenant, JIT, is responsible for 52%.

32.    But, the express provisions of Paragraph 9 of the Lease do not require Jerich to pay for any replacements made by Landlord within the common areas of the Property.  Rather, Jerich's obligation is expressly limited to "**maintenance** of the …parking areas, entrances, driveways and management thereof."

33.    And the parties knew how to use the word "replacements," and they specifically left it out of Paragraph 9 of the Lease — the Paragraph in controversy here.

34.    In fact, Paragraph 9 of the Lease gives examples of things that are considered "maintenance," including "mowing of the grass, care of the shrubs," and "general landscaping."

35.    Merriam Webster defines "maintenance" as "the upkeep of property or equipment" while defining the word "replace" as "to put something new in place of."

36.    Here, CenterPoint demands Jerich pay for the latter when all that is provided for in the Lease is the former.

37. Indeed, in 2017, Jerich was only assessed $275.00 as its pro rata share for parking lot maintenance.

38. If CenterPoint's extravagant new Truck Court estimate of $546,956.00 is considered CAM, that would mean Jerich's portion would be $262,538.88. That is almost 1000 times more than Jerich paid in CAM for the Truck Court maintenance in 2017.

39. This stark juxtaposition makes clear that CenterPoint proposed a capital improvement, not a maintenance item, and Jerich is not responsible for it.

40. The Lease further provides that if the Tenant is a prevailing party in any dispute between Tenant and Landlord, "Landlord agrees to pay any and all attorneys' fees and expenses Tenant incurs in enforcing any of the obligations of Landlord under this Lease."

**B.     The Shakedown**

41. On August 2, 2018, Defendant's New Jersey based Property Manager Eastern Region, Harold Campbell e-mailed Jerich, advising that Defendant was preparing to replace the truck courts and parking areas at the Property.  In his e-mail, CenterPoint's representative notified Jerich that any replacement related to the Truck Court would constitute "a CAM expense that [Plaintiff is] required to pay" its pro rata share of under the Lease.

42. In connection with this demand, CenterPoint sent Jerich its estimate of $546,956.00. However, this estimate was for a brand new Truck Court, with substantially upgraded specifications from the original construction of the Truck Court. This was the first sign that this was a shakedown. Maintenance does not normally include substantial upgrades. Substantial upgrades are more commonly known as capital improvements.

43. As set forth above, even if the Truck Court replacement CenterPoint hopes Jerich will pay for is CAM, Jerich's proportionate share is limited to 48%.

44.     However, since CenterPoint was not a party to the original lease between Jerich and MGCC, CenterPoint has no idea what the parties intended. Only Jerich knows, and Jerich's interpretation is controlling. And the original contracting parties never intended for Jerich to pay for capital improvements or Truck Court replacements.

45.     So, on September 28, 2018, Jerich wrote to CenterPoint's New Jersey based Property Manager, Harold Campbell, advising him that Jerich disputes (a) that the Truck Court replacement constitutes common area maintenance under the express terms of the Lease, and (b) the Truck Court's cost and upgraded specifications.

46.     Betraying its dubious motives, CenterPoint then launched into barrage of constantly shifting interpretations of the Lease, all in an effort to pawn off its capital improvement on its tenant, despite the parties never intending that result and the Lease expressly rejecting it.

47.     For example, in response to Jerich's September 28, 2018 letter rejecting CenterPoint's demand that Jerich pay for the Truck Court, CenterPoint wrote to Jerich on October 17, 2018, rejecting its own previous interpretation of the CAM provision and stating that Jerich's share of the cost was now 62% based on "the pro rata share that is **used** by Jerich." In this letter CenterPoint demanded $340,730.48 of the $546,956 estimate. This demand has no basis in the Lease.

48.     Nowhere in the CAM provision (Paragraph 9) does the Lease provide that Jerich is responsible for the proportionate share of the common area **used** — all it says is Jerich is responsible for its "proportionate share" which is based on the square footage of the warehouse that Jerich **occupies**.

49.     Then, CenterPoint moved the goal posts again. In a December 21, 2018 email to Jerich, CenterPoint demanded $380,018.87. Said differently, after originally saying the Truck

Court replacement was CAM and Jerich's share was limited to 48%, CenterPoint then baselessly demanded Jerich pay 62%. When that did not work, CenterPoint again changed its interpretation of the Lease and demanded Jerich pay almost 70% of the estimated cost of CenterPoint's new Truck Court.

50.     In the December 2018 email, CenterPoint even attached a photoshopped map of the property where they arbitrarily designated which portions of the Truck Court Jerich uses and which portions the other tenant, JIT uses.

51.     This new photoshopped map is found nowhere in the Lease, and it does change the Lease's express language. CenterPoint simply created it for purposes of this shakedown.

52.     Another reason CenterPoint keeps increasing the amount it is demanding from Jerich, is that the other tenant, JIT (the mom and pop shop) — like Jerich — has refused to pay for any of the Truck Court replacement costs.

53.     Without any contribution from the JIT, CenterPoint hopes it can coerce Jerich, the "deeper pocket," to offset JIT's refusal to contribute.

54.     These consistently inconsistent interpretations of the Lease, and JIT's refusal to contribute, expose CenterPoint's dishonest motives here. This is a shakedown, and CenterPoint's demands are wholly untethered to the express language of the Lease.

55.     Jerich has refused to pay these amounts to CenterPoint and contends that the plain language of the Lease does not require Jerich to pay CAM charges for replacing the truck courts and parking areas at the Property. And even if the Truck Court replacement could be considered CAM, then Jerich is not responsible for the substantial upgrades CenterPoint proposes based on the one quote CenterPoint received from the most expensive contractor in the area.

## *COUNT I*
### (Declaration Pursuant to 28 U.S.C. 2201-2202)

56.     Jerich incorporates by reference the allegations contained in the preceding Paragraphs as if fully set forth herein at length.

57.     Jerich/tenant seeks declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201-2202, to resolve its dispute with CenterPoint/landlord regarding the interpretation of the parties' Lease.

58.     Pursuant 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

59.     Jerich brings this action under the Federal Declaratory Judgment Act to interpret the parties' contractual obligations related to the replacement of the Truck Court and parking areas at the Property.

60.     Jerich contends that under the plain language of the Lease, it is not obligated to pay the costs associated with the Truck Court/parking lot replacement.

61.     Alternatively, even if Jerich is responsible for CAM costs, those costs were controllable by CenterPoint, and thus Jerich's portion is limited by Paragraph 9 of the Lease.

62.     Alternatively, even if Jerich is responsible for CAM costs, Jerich is not responsible for any portion of these costs that constitute upgraded specifications from the original Truck Court.

63.     Jerich further contends that under the plain language of the Lease, CenterPoint is liable to Jerich for its attorneys' fees and costs associated with the enforcement of its and CenterPoint's rights and obligations under the Lease.

### *COUNT II*
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

64.     Jerich incorporates by reference the allegations contained in the preceding Paragraphs as if fully set forth herein at length.

65.     CenterPoint's attempts to enforce a contractual provision that does not exist and pawn off the expense of an extravagant capital improvement to its property on Jerich have been in bad faith.

66.     CenterPoint's attempts are dishonest, improperly motivated, and intended to destroy or injure Jerich's rights under the Lease.

67.     CenterPoint's actions have denied Jerich the benefit of its bargain under the Lease.

68.     As a result, Jerich has been and will continue to be damaged.

**WHEREFORE,** Jerich respectfully requests the Court enter the following relief pursuant to 28 U.S.C. § 2201-2202, *et. seq.* against CenterPoint:

(a)     A Declaration that the Lease does not allow CenterPoint to assess CAM charges against Jerich arising from the replacement and upgrade of the Truck Court areas of the Property; or

(b)     A Declaration that even if such a capital improvement is considered CAM, that it was controllable and therefore limited by Paragraph 9 of the Lease; or

(c)     A Declaration that even if such capital improvement is considered CAM, Jerich is not responsible for any component constituting upgraded specifications from the original Truck Court; and

(d)     Contractual Attorney's fees;

(e)     Costs of suit;

(f)     Direct and consequential damages; and

(g)     Any other relief that this Court deems just and equitable.

**BRACH EICHLER L.L.C.**

By:  /s/ Lucas Markowitz
Lucas Markowitz, Esq.
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
lmarkowitz@bracheichler.com
*Attorneys for Plaintiff*
*Jerich USA, Inc.*

Dated:  March 4, 2019

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Pursuant to Local Civil Rule 11.2, the undersigned hereby certifies that neither Plaintiff nor counsel is aware of any other action pending in any court, or of any pending arbitration or administrative proceeding that is related to the matter in controversy.

**BRACH EICHLER L.L.C.**

By:  /s/ Lucas Markowitz
Lucas Markowitz, Esq.
101 Eisenhower Parkway
Roseland, NJ 07068
(973) 228-5700
lmarkowitz@bracheichler.com
*Attorneys for Plaintiff*
*Jerich USA, Inc.*

Dated:  March 4, 2019

# EXHIBIT A

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease"), made and entered into as of _July 16_, 2014 (the "date of this Lease") by and between Jerich USA, Inc. a New Jersey corporation (hereinafter referred to as "Tenant"), and McDonald Georgia Commerce Center 400, LLC. A Georgia limited liability company (hereinafter referred to as "Landlord");

## W I T N E S S E T H

1.    <u>PREMISES</u>.    For and in consideration of the obligation of Tenant to pay rent as herein provided, and in consideration of the other terms, provisions and covenants hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby leases from Landlord certain premises (Suite 100) being approximately 136,458 square feet of space (the "Premises") shown on Exhibit "B", within the building known as Building 400 at Georgia Commerce Center Two (the "Building"), located at 320 Telfair Road, Savannah, Chatham County, Georgia 31415, described on Exhibit "A" attached hereto and incorporated herein by reference, together with all rights, privileges, easements, and appurtenances belonging to or in any way pertaining to said Premises (hereinafter collectively the "Property").

Tenant acknowledges that no representations as to the condition of the Premises have been made by Landlord, and Tenant accepts the Premises in their "as-is" condition with all faults, except that prior to the Commencement Date, as hereinafter defined, Landlord shall provide new paint and carpet in the existing office area using Landlord's building standards and relocate the existing demising fence to demise the Premises.

TO HAVE AND TO HOLD the Premises for the Demised Term, as hereinafter defined.

2.    <u>TERM</u>. The Term of this Lease (hereinafter referred to as the "Demised Term") shall be for a period commencing on September 1, 2014 and ending one hundred twenty-four (124) months thereafter, unless sooner terminated as provided in this Lease; provided, however, that, in the event the Commencement Date is not the first day of a calendar month, the Demised Term shall extend for the remainder of the calendar month in which the Commencement Date occurs plus said number of months.

3.    <u>BASE RENT</u>.

A.    Tenant agrees to pay Landlord rent for the Premises ("Base Rent"), in advance, without demand, deduction or set off, for the Demised Term at the rate of Forty-Two Thousand Six Hundred Forty-Three and No/100s Dollars ($42,643.00) per month ($3.75 per rentable square foot). The first monthly installment of Base Rent shall be due and payable on the date hereof and a like monthly installment of Base Rent shall be due and payable on or before the first day of each calendar month thereafter during the Demised Term, except that the rent payment for any fractional calendar month at the commencement or end of the Demised Term shall be prorated on the basis of a thirty-day month.

B.    Landlord and Tenant agree that the Base Rent set forth in Paragraph 3.A. above shall increase by two and one-quarter percent (2.25%) at the beginning of the twenty-fifth (25th) full calendar month of the Demised Term, which adjusted rent amount shall remain in effect for the next twelve (12) consecutive months and shall increase by two and one-quarter percent (2.25%) each twelve (12) months thereafter for the balance of the Demised Term; it being the express intention of the parties that in the event the Commencement Date is not the first day of a calendar month, the anniversary date of the rent adjustment hereunder shall be the first day of the first full calendar month. Whenever Base Rent is escalated under this Lease based on a percentage increase, the resulting escalated Base Rent amount shall be rounded up or down to the nearest whole dollar.

4.    <u>SECURITY DEPOSIT</u>.    Tenant agrees to deposit with Landlord on the date hereof, in addition to the rent specified in Paragraph 3, the sum of Forty-Two Thousand Six Hundred Forty-Three and No/100s Dollars ($42,643.00), which sum shall be held by Landlord, without obligation for interest (except as may be required by law), as security for the performance of Tenant's covenants and obligations under this Lease, it being expressly understood and agreed that such deposit is not an advance rent payment or a measure of Landlord's damages in case

of Tenant's default.  To secure all rents and other sums of money due and obligations of Tenant hereunder, Tenant grants Landlord a valid first lien security interest in its Security Deposit.  Upon the occurrence of any event of default by Tenant under this Lease, Landlord may (but without obligation to do so), from time to time, without prejudice to any other remedy provided herein or provided by law or in equity, use this security deposit to the extent necessary to make good any arrears of rent or other payments due Landlord hereunder, and any other damage, injury, expense or liability caused by such event of default.  Tenant shall pay Landlord, on demand, the amount of the security deposit so applied in order to restore the security deposit to its original amount.  This security deposit shall be deemed the property of Landlord, but any remaining balance of such deposit shall be returned by Landlord to Tenant at such time after termination of this Lease and that all of Tenant's obligations under this Lease have been fulfilled.

     5.    <u>USE</u>.  The Premises shall be used only for general office purposes, and for the purpose of receiving, storing, shipping and selling (other than retail) products, materials and merchandise made and/or distributed by Tenant and for such other lawful purposes as may be incidental thereto.  Outside storage, including without limitation, trucks and other vehicles, is prohibited without Landlord's prior written consent.  Tenant shall at its own cost and expense, obtain any and all other licenses and permits necessary for any such use.  Tenant shall comply with all governmental laws, ordinances and regulations applicable to the use of the Premises, and shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of nuisances in or upon, or connected with, the Premises, all at Tenant's sole expense.  Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise or vibrations to emanate from the Premises, nor take any other action which would constitute a nuisance or would disturb or endanger any other tenants of the building or buildings in which the Premises are situated or unreasonably interfere with their use of their respective premises.  Without Landlord's prior written consent, Tenant shall not receive, store or otherwise handle any product, material or merchandise which is explosive or highly inflammable.  Tenant will not permit the Premises to be used for any purpose or in any manner (including without limitation, any method of storage) which would render the insurance thereon void or the insurance risk more hazardous or cause the State Board of Insurance or other insurance authority to disallow any sprinkler credits.  Tenant shall not use the Premises for the generation, storage, transportation or disposal of dangerous, toxic or hazardous materials, chemicals, wastes or similar substances.

     6.    <u>TAXES</u>.

     A.    Landlord agrees to pay before delinquency, all taxes, assessments and governmental charges of any kind and nature whatsoever (hereinafter collectively referred to as "taxes") lawfully levied or assessed against the Property.  Tenant agrees to pay to Landlord, as additional rent, upon demand, the amount of Tenant's projected "proportionate share" of the taxes assessed against the Property.  Tenant's "proportionate share", as used in this Lease, shall mean a fraction, the numerator of which is the gross square footage contained in the Premises and the denominator of which is the gross square footage contained in the building or buildings located on the Property.  At the end of each year, Landlord shall determine the actual costs of such taxes.  Any savings will be credited against the following year's payments, or, if at the expiration of the Demised Term, refunded to Tenant, and any balances will be paid upon receipt of invoice.

     B.    If at any time during the Term of this Lease, the present method of taxation shall be changed so that in lieu of the whole or any part of any taxes, assessments or governmental charges, levied, assessed or imposed on real estate and the improvements thereon, there shall be charged, levied, assessed or imposed on Landlord a capital levy or other tax directly on the rents received therefrom and/or a franchise tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents for the present or any future building or buildings on the Property, then all such taxes, assessments, levies or charges, or the part thereof so measured or based, shall be deemed to be included within the term "taxes" for the purposes hereof.

     C.    The Landlord shall have the right (but no obligation) to employ a tax-consulting firm to attempt to assure a fair tax burden on the building or buildings on the Property within the applicable tax jurisdiction.  Tenant shall pay to Landlord upon demand from time to time, as additional rent, the amount of Tenant's "proportionate share" (as defined in subparagraph 6.A herein) of the cost of such service, which is normally a contingency fee based on a percentage of tax savings generated by the tax firm.

D.      Any payment to be made pursuant to this Paragraph 6 shall be prorated in the event any portion of the Demised Term is not within a full real estate tax year.

7.      **LANDLORD'S REPAIRS.**      Landlord, at its expense, shall maintain only the roof, foundation and the structural soundness of the exterior walls of the Premises in good repair, reasonable wear and tear excepted. Tenant shall repair and pay for any damage caused by the negligence of Tenant, or Tenant's employees, agents or invitees, or caused by Tenant's default hereunder. The term "walls" as used herein shall not include windows, glass or plate glass, doors, special storefronts or office entries. Tenant shall immediately give Landlord written notice of defects or need for repairs, after which Landlord shall have reasonable opportunity to repair same or cure such defects.  Landlord's liability with respect to any defects, repairs or maintenance for which Landlord is responsible under any of the provisions of this Lease shall be limited to the cost of such repairs or maintenance or the curing of such defects.

8.      **TENANT'S REPAIRS.**

A.      Tenant shall at its own cost and expense keep and maintain all parts of the Premises (except those for which Landlord is expressly responsible under the terms of this Lease) in good condition, promptly making all necessary repairs and replacements, including but not limited to, windows, glass and plate glass, doors, any special office entry, interior walls and finish work, floors and floor covering, heating and air condition systems, dock boards, truck doors, dock bumpers, plumbing work and fixtures, termite and pest extermination, and regular removal of trash and debris.

Tenant shall provide Landlord with prior notice of any repair to be undertaken by Tenant costing in excess of $1,000 (in Tenant's reasonable estimation) and such other information as Landlord may reasonably request with respect to such repair, except such notice shall not be required if immediate repair is necessary for security or safety reasons.

B.      Tenant shall not damage any wall or disturb the integrity and support provided by any wall and shall, at its sole cost and expense, promptly repair any damage or injury to any wall caused by Tenant or its employees, agents or invitees.

C.      Tenant shall, at its own cost and expense, enter into a regularly scheduled preventive maintenance/service contract with a maintenance contractor for servicing all heating and air conditioning systems and equipment within the Premises.  The maintenance contractor and the contract must be approved by Landlord. The service contract must include all services suggested by the equipment manufacturer within the operation/maintenance manual and must become effective (and a copy thereof delivered to Landlord) no later than thirty (30) days after the Commencement Date.  In the event Landlord has not received a copy of Tenant's service contract described herein within thirty (30) days after the Commencement Date, Landlord may, at its option, enter into a service contract on behalf of Tenant, and Tenant shall reimburse Landlord, within ten (10) days of notice from Landlord, for the cost of such service contract, as additional rent.

Notwithstanding the foregoing, Landlord will warrant, for the first twelve (12) months of the Demised Term (the "Warranty Period'), that all heating, cooling, ventilation, and air conditioning systems are in good working order.  Landlord will assume responsibility for repairs and replacements during the Warranty Period, but not routine maintenance. During the Warranty Period and throughout the term of the Lease, Tenant will be responsible for any required maintenance to all systems in compliance with any warranties as recommended as part of the preventative maintenance agreement. Upon expiration of the Warranty Period, Tenant will be responsible for repairs, replacements and maintenance of the HVAC units as required herein.  Upon expiration of the Warranty Period, and provided there has not been an event of Default, Landlord will agree to cap HVAC repairs or replacements at $1,000.00 per unit per lease year for the balance of the Demised Term (the "Cap"). The Cap shall not apply during any Renewal Term. Tenant will not be allowed to apply the cost of the regular maintenance contract towards the Cap. Tenant shall notify Landlord in writing of any repairs or replacements needed that exceed the above-referenced Cap prior to such repairs and replacements being made. Tenant must use one of Landlord's preferred contractors for all unit maintenance and repairs. The Cap will be null and void if Tenant has not: i) kept a quarterly maintenance contract with a licensed contractor, approved by Landlord and on file with Landlord, in place over the term of the lease to maintain the applicable equipment per the manufacturer's recommendations;   ii)

performed the maintenance recommended by the licensed contractor to keep the units in good repair; iii) complied with any warranties (if applicable); (iv) notified Landlord in writing prior to such repairs and replacements being made; and (v) kept accurate and complete records of the performance of all scheduled maintenance under the service contract and provided copies thereof to Landlord from time to time upon request by Landlord. The Cap will not apply to HVAC units for: i) server rooms (supplemental units), warehouse areas, production areas, assembly areas, data center rooms, HVAC units that are replaced as a part of this Cap during the Demised Term, or units less than seven (7) years old.

9.      COMMON AREA MAINTENANCE.

A.      Tenant shall pay to Landlord as additional rent a common area operating and maintenance fee equal to Tenant's "proportionate share" (as defined in subparagraph 6.A. herein) of the cost and expense for the operation and maintenance of the common areas of the building and park in which the Premises are located, including, but not limited to, the mowing of grass, care of shrubs, general landscaping, common sewage line plumbing, maintenance of building, parking areas, entrances, driveways and management thereof. If Tenant or any other particular tenant of the building can be clearly identified as being responsible for obstructions or stoppage of the common sanitary sewage line, then Tenant, if Tenant is responsible, or such other responsible tenant, shall pay the entire cost thereof, upon demand, as additional rent. Payment shall be made on the first day of each month based on the projected cost of such maintenance. At the end of each year, Landlord shall determine the actual costs of such maintenance. Any additional costs due from Tenant based on the actual costs shall be promptly paid by Tenant. Any savings will be credited against the following year's payments.

B.      Notwithstanding anything in this Paragraph 9 to the contrary, Tenant's proportionate share of increases in "controllable" CAM in any calendar year during the Demised Term shall not exceed such "controllable" CAM attributable to the Premises for the immediately preceding calendar year multiplied by 108% compounded annually from the first calendar year of this Lease. For purposes of this subparagraph 9.B., "controllable" CAM is defined to be all CAM under reasonable control of Landlord.

C.      In addition to the CAM costs above, Tenant shall pay to Landlord a management fee equal to three percent (3%) of Base Rent paid in accordance with the Lease on a monthly basis, which payment shall be made on the first day of each month and shall be capped at three percent (3%) during the term of the Lease.

10.      TENANT IMPROVEMENTS TO PREMISES.      Tenant shall not make any alterations, additions or improvements to the Premises, exterior or interior (the "Tenant Alterations"), without the prior written consent of Landlord, except for unattached movable furniture and equipment which may be installed without drilling, cutting or otherwise defacing, damaging or overloading the Premises. Without limiting the generality of the foregoing, Tenant acknowledges that floor striping of any kind constitutes a Tenant Alteration requiring the prior written approval of Landlord. The Tenant Alterations shall be deemed for all purposes a part of the real property of the Building immediately upon the installation thereof and shall remain on the Premises as Landlord's property at the expiration or earlier termination of the term hereof without compensation to Tenant, unless Landlord elects by notice to Tenant to have Tenant remove such Tenant Alterations, in which event, Tenant, at its sole cost and expense, shall promptly remove such Tenant Alterations and restore the Premises to its condition prior to the installation of such Tenant Alterations, normal wear and tear excepted (it being agreed that any damages resulting from the removal of any Tenant Alterations shall not constitute normal wear and tear). Tenant may not use or penetrate the roof of the Premises for any purpose whatsoever without Landlord's prior written consent. All construction work done by Tenant in the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements, and at such times and in such manner as will cause a minimum of interference with other construction in progress and with the transaction of business in the building or buildings in which the Premises are located.

11.      SIGNAGE.      Landlord shall install, at its expense, Tenant's name and suite number on the building directory sign, and Tenant may install its name and logo on the door to the Premises. Tenant shall not install any signs visible from outside the Premises except with the prior written consent of Landlord. Any permitted signs shall be maintained in compliance with applicable governmental rules and regulations governing such signs. Tenant shall be responsible to Landlord for any damage caused by the installation, use or maintenance of said signs. Tenant agrees, upon removal of said signs, to repair all damage (including discoloration) incident thereto.

12. <u>RIGHT OF ENTRY INSPECTION.</u>     Landlord and Landlord's agents and representatives shall have the right to enter and inspect the Premises at any reasonable time during business hours, upon reasonable advance notice (except in cases of emergency), to ascertain the condition of the Premises, to make such repairs as may be required or permitted to be made by Landlord under the terms of this Lease, or to show the Premises to prospective purchasers or tenants.  Landlord shall have the right to place or erect on the Premises a suitable sign indicating the Premises are available for rent during the last six (6) months of the Demised Term.

Tenant shall give written notice to Landlord at least thirty (30) days prior to vacating the Premises and shall arrange to meet with Landlord for a joint inspection of the Premises prior to vacating.  In the event of Tenant's failure to give such notice or arrange a joint inspection, Landlord's inspection at or after Tenant's vacating the Premises shall be conclusively deemed correct for purposes of determining Tenant's responsibility for repairs and restoration.

13. <u>UTILITIES.</u>     Landlord agrees to provide at its cost water, electricity and telephone service connections into the Premises; but Tenant shall pay for all water, gas, heat, light, power, telephone, sewer, sprinkler charges and other utilities and services used in or from the Premises, together with any taxes, penalties, surcharges or the like pertaining thereto and any maintenance charges for utilities and shall furnish all electric light bulbs and tubes.  If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion as determined by Landlord of all charges jointly metered with other premises.  Landlord shall in no event be liable for any interruption or failure of utility services on the Premises.

14. <u>ASSIGNMENT AND SUBLETTING.</u>

A.     Tenant shall not, directly or indirectly, have the right to assign this Lease or to sublet the whole or any part of the Premises without the prior written consent of Landlord.  Consent to any assignment or sublease shall not be deemed a waiver of the right of Landlord to approve or disapprove a further assignment or subletting.  Notwithstanding any permitted assignment or subletting, Tenant shall at all times remain directly, primarily and fully responsible and liable for the payment of the rent herein specified and for compliance with all of its other obligations under the terms, provisions and covenants of this Lease.  Upon the occurrence of an "event of default", as hereinafter defined, if the Premises or any part thereof are then assigned or sublet, Landlord, in addition to any other remedies herein provided, or provided by law, may at its option collect directly from such assignee or subtenant all rents becoming due to Tenant under such assignment or sublease and apply such rent against any sums due to Landlord from Tenant hereunder, and no such collection shall be construed to constitute a novation or a release of Tenant from the further performance of Tenant's obligations hereunder.  For purposes of this Paragraph 14, each of the following events shall be deemed an assignment:

(i)     if Tenant is a partnership, a dissolution of the partnership or a change in ownership, legal or beneficial, of 50% or more of the partnership interests, whether by withdrawal or admission, voluntary or by operation of law;

(ii)     if Tenant is a corporation, the dissolution, consolidation or merger of Tenant or the sale or transfer of more than 50% of the voting shares of Tenant;

(iii)     distribution or sale of over 50% of the value of Tenant's assets (net of undistributed consideration received); or

(iv)     any other change of effective control of Tenant.

B.     In the event that Tenant assigns this Lease or sublets the Premises or any part thereof, as permitted herein, and at any time receives rent and/or other consideration which exceeds that which Tenant would at that time be obligated to pay Landlord, Tenant shall pay to Landlord 50% of the gross excess in such rent as such rent is received by Tenant and 50% of any other consideration received by Tenant from such assignee or subtenant.  In addition, should Landlord agree to an assignment or sublease agreement, Tenant will pay to Landlord on demand a sum equal to all Landlord's costs, including reasonable attorney's fees, incurred in connection with such assignment or transfer.  If an assignment or subletting is approved, Tenant shall be entitled to deduct from any

excess proceeds described in this subparagraph 14.B. its reasonable expenses incurred in connection with such assignment or subletting.

15.     UNDERLINE{INSURANCE.}

A.     Landlord agrees to maintain special form perils insurance covering the building or buildings of which the Premises are a part in an amount not less than 80% (or such greater percentage as may be necessary to comply with the provisions of any co-insurance clauses of the policy) of the "replacement cost" thereof as such term is defined in the Replacement Cost Endorsement to be attached thereto, insuring against the perils of Fire, Lightning and Special Form Coverage, such coverage and endorsements to be as defined, provided and limited in the standard bureau forms prescribed by the insurance regulatory authority for the State in which the Premises are situated for use by insurance companies admitted in such state for the writing of such insurance on risks located within such state. Subject to the provisions of this Paragraph 15, such insurance shall be for the sole benefit of Landlord and under its sole control. Landlord may, but is not obligated to, maintain such other insurance and additional coverage as it may deem necessary, including but not limited to, loss of rental income, flood and earthquake insurance.

Tenant agrees to pay to Landlord, as additional rent, the amount of Tenant's "proportionate share" of the cost of Landlord's insurance coverage on the building, all costs and premiums of all insurance, including but not limited to property, casualty, business interruption, boiler and machinery, flood, earthquake and commercial general liability insurance applicable to the building, the common areas and the operation thereof, and Landlord's personal property used in connection therewith. Said payments shall be made to Landlord within ten (10) days after presentation to Tenant of Landlord's statement setting forth the amount due. Any payment to be made pursuant to this subparagraph 15.A. shall be prorated for any portion of the Demised Term that is not a full premium period under said insurance policy. Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems as necessary as a result of Tenant's use of premises.

B.     Tenant shall, throughout the Term of this Lease, at its cost and expense, provide and keep in force: (1) a commercial general liability insurance policy for bodily injury, property damage, and personal injury to a third party in the amount of not less than $1,000,000 per occurrence and $2,000,000 on an aggregate basis; (2) property insurance on its own personal property located on the Premises to the extent Tenant elects; (3) workers' compensation insurance as required by the state in which the Premises is located and in amounts as may be required by applicable statute and shall include a waiver of subrogation in favor of Landlord; (4) employers liability insurance of at least $500,000; (5) business automobile liability insurance having a combined single limit of not less than $1,000,000 per occurrence insuring Tenant against liability arising out of the ownership, maintenance or use of any owned, hired or nonowned automobiles; and (6) business interruption insurance with a limit of liability representing at least six months of lost income. All such insurances shall provide that the Tenant's coverage shall be primary and noncontributing with other coverage maintained by any additional insured affiliates and subsidiaries, including, without limitation, McDonald Development Company.

All insurance provided by Tenant as required by this subparagraph 15.B. shall name, as additional insured, Landlord and any mortgagees or deed to secure debt holders of the Premises, and be carried by such responsible companies and in such form satisfactory to Landlord.

All insurance required by the terms of this Paragraph 15 must be issued by and binding upon an insurance company licensed or authorized to do business in the State of Georgia, rated at least Rating A-, Financial Size VII by A.M. Best Company (or an equivalent rating by another rating agency if the Best's ratings are discontinued).

Tenant agrees to deliver to Landlord on or before the Commencement Date the original policy of insurance required by this subparagraph 15.B. or certificate thereof and evidence of payment of premium. At least thirty (30) days prior to the expiration of each such policy, Tenant shall deliver to Landlord the new original policy or certificate for renewal insurance and evidence of payment of premium. In the event Landlord has not received (on or before the Commencement Date) evidence of Tenant's compliance with the insurance coverages required by this subparagraph 15.B., Landlord may, but shall not be required to, secure coverage on behalf of Tenant in the amounts required by this subparagraph 15.B with companies satisfactory to Landlord. Tenant shall pay the costs of

such coverage directly, or, if paid by Landlord, reimburse Landlord as additional rent, within ten (10) days of notice, for all costs incurred by Landlord in securing such coverage.

Tenant shall not violate or knowingly permit to be violated any of the conditions or provisions of any policy required by this subparagraph 15.B.

Each insurance policy (including renewal insurance) or certificates thereof issued by the insurer shall contain an agreement by the insurer that such policy shall not be canceled without at least thirty (30) days prior written notice to Landlord and any mortgagee or deed to secure debt holder of the Premises, and in no event shall such policies be canceled by Tenant without Landlord's prior written consent.

C.    Tenant and Landlord shall cooperate in connection with the collection of any insurance monies that may be due in the event of loss.  Tenant and Landlord shall execute and deliver such proofs of loss and other instruments that may be required for the purpose of obtaining the recovery of any such insurance monies.

D.    Any insurance provided for in this Paragraph 15 may be effected by a policy or policies of blanket insurance; provided, however, that the amount of the total insurance allocated to the Premises shall be such as to furnish in protection the equivalent of separate policies in the amount herein required, and provided further that in all other respects, any such policy or policies shall comply with the other provisions of this Lease.  In any such case, it shall not be necessary to deliver the original of any such blanket policy, but rather a certified duplicate of such policy or certificate thereof.

16.    <u>DAMAGE OR DESTRUCTION: SUBROGATION</u>.

A.    If the Premises should be damaged or destroyed by fire, tornado or other casualty, Tenant shall give immediate written notice thereof to Landlord.

B.    If the Premises should be totally destroyed by fire, tornado or other casualty, or if they should be so damaged thereby that rebuilding or repairs cannot, in Landlord's estimation, be completed within two hundred (200) days after the date upon which Landlord is notified by Tenant of such damage, this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective upon the date of the occurrence of such damage.

C.    If 70% or more of the gross square footage of the building in which the Premises are located is damaged or destroyed by any peril or casualty, Landlord and Tenant shall have the right to terminate this Lease.  Subject to the foregoing, if the Premises should be damaged or destroyed by any peril covered by the insurance to be provided by Landlord under subparagraph 15.A., but only to the extent that rebuilding or repairs can in Landlord's estimation be completed within two hundred (200) days after the date upon which the Landlord is notified by Tenant of such damage, this Lease shall not terminate, and Landlord shall at its sole cost and expense thereupon proceed with reasonable diligence to rebuild and repair such buildings to substantially the condition in which they existed prior to such damage, except that Landlord shall not be required to rebuild, repair or replace any part of the partitions, fixtures, addition and other improvements which may have been placed in, on or about the Premises by Tenant.  If the Premises are untenantable in whole or in part following such damage, the rent payable hereunder during the period in which they are untenantable shall be reduced to such extent as may be fair and reasonable under all of the circumstances.  In the event that Landlord should fail to complete such repairs and rebuilding within two hundred (200) days after the date upon which Landlord is notified by Tenant of such damage, Tenant may at its option terminate this Lease by delivering written notice of termination to Landlord as Tenant's exclusive remedy, whereupon all rights and obligations hereunder shall cease and terminate.

D.    Notwithstanding anything herein to the contrary, in the event the holder of any indebtedness secured by a mortgage or deed to secure debt covering the Premises requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is made by any such holder, whereupon all rights and obligations hereunder shall cease and terminate.

E.     Each of Landlord and Tenant hereby releases the other from any loss or damage to property caused by fire or any other perils insured through or under them by way of subrogation or otherwise for any loss or damage to property caused by fire or any other perils insured in policies of insurance covering such property, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such times as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder and then only to the extent of the insurance proceeds payable under such policies. Each of the Landlord and Tenant agrees that it will request its insurance carriers to include in its policies such a clause or endorsement. If extra cost shall be charged therefore, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so.

17.     LIABILITY.     Landlord shall not be liable to Tenant or Tenant's employees, agents, invitees, patrons or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Premises, resulting from and/or caused in part or whole by, the negligence or misconduct of Tenant, its employees, agents, invitees, patrons or visitors, or of any other person entering upon the Premises, or caused by the buildings and improvements located on the Premises becoming out of repair, use, generation, storage or disposal of toxic or hazardous materials or substances on or about the Premises, or caused by leakage of gas, oil, water or steam or by electricity emanating from the Premises, or due to any cause whatsoever. Tenant hereby covenants and agrees that it will at all times indemnify and hold safe and harmless the property, the Landlord (including without limitation, the trustee and beneficiaries if Landlord is a trust), Landlord's agents and employees from any loss, liability, claims, suits, costs, expenses, including without limitation, attorney's fees and damages, both real and alleged, arising out of any such damage or injury, except injury to persons or damage to property the sole cause of which is the negligence of Landlord or the failure of Landlord to repair any part of the Premises which Landlord is obligated to repair and maintain hereunder within a reasonable time after the receipt of written notice from Tenant of needed repairs.

18.     CONDEMNATION.

A.     If 70% or more of the gross square footage of the building in which the Premises are located should be taken for public or quasi-public use under governmental law, ordinance or regulation by right of eminent domain, or by private purchase in lieu thereof, Landlord and Tenant shall have the right to terminate this Lease and the rent shall be abated effective on the date of Landlord's election to so terminate. Additionally, if the whole or any substantial part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof and the taking would prevent or materially interfere with the use of the Premises for the purpose for which that are being used, this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective on the date of the physical taking of the Premises.

B.     If part of the Premises shall be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, and this Lease is not terminated as provided in subparagraph 18A., this Lease shall not terminate but the rent payable hereunder during the unexpired portion of this Lease shall be reduced to such extent as may be fair and reasonable under all of the circumstances.

19.     HOLDING OVER.     Tenant shall, at the termination of this Lease by lapse of time or otherwise, deliver immediate possession of the Premises to Landlord. If Landlord agrees in writing that Tenant may hold over after the expiration or termination of this Lease, unless the parties hereto otherwise agree in writing on the terms of such holding over, the hold over tenancy shall be subject to termination by Landlord at any time upon not less than five (5) days advance written notice, or by Tenant at any time upon not less than thirty (30) days advance written notice, and all of the other terms and provisions of this Lease shall be applicable during that period, except that Tenant shall pay Landlord from time to time, upon demand, as rent for the period of any such hold over, an amount equal to one hundred twenty-five percent (125%) of the rent in effect on the termination date for the first sixty (60) days of the holdover period and an amount equal to one hundred fifty percent (150%) of the rent in effect on the termination date thereafter, computed on a daily basis for each day of the hold over period. No holding over

by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided.  The preceding provisions of this Paragraph 19 shall not be construed as Landlord's consent for Tenant to hold over.

20.     <u>QUIET ENJOYMENT</u>.     Landlord represents and warrants that it has full right and authority to enter into this Lease and that Tenant, upon paying the rent herein set forth and performing its other covenants agreements herein set forth, shall peaceably and quietly have, hold and enjoy the Premises for the Demised Term hereof, subject to the terms and provisions of this Lease.

21.     <u>EVENTS OF DEFAULT</u>. The following events shall each be deemed an event of default by Tenant under this Lease:

A.     Tenant shall fail to pay any installment of the rent herein required when due, or any payment with respect to taxes hereunder when due, or any other payment or reimbursement to Landlord required herein when due, and such failure shall continue for a period of five (5) days from the date such payment was due.

B.     Tenant shall become insolvent, or shall make a transfer to defraud creditors, or shall make an assignment for the benefit of creditors.

C.     Tenant shall file a petition under any section or chapter of the National Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Tenant thereunder.

D.     A receiver or trustee shall be appointed for all or substantially all of the assets of Tenant.

E.     Tenant shall desert, abandon or vacate any substantial portion of the Premises.

F.     Tenant shall fail to deliver an estoppel certificate to Landlord within the time frame set forth in Paragraph 24.

G.     Tenant shall fail to comply with any term, provision or covenant of this Lease (other than as set forth in clauses A through F in this Paragraph 21), and shall not cure such failure within twenty (20) days after written notice thereof to Tenant.

22.     <u>REMEDIES</u>.     Upon the occurrence of any of the events of default described in Paragraph 21 hereof, Landlord shall have the option to pursue any one or more of the following remedies without notice or demand whatsoever:

A.     Immediately or at any time thereafter terminate this Lease, and this Lease shall be deemed to have been terminated upon giving of notice of such termination pursuant to Paragraph 26 hereof.  Upon such termination, Landlord shall have the right to recover from Tenant, as liquidated damages, the following:

(1)     the worth, at the time of the award, of the unpaid rent that has been earned at the time of termination of this Lease: and

(2)     the worth, at the time of the award, of the amount by which the unpaid rent that would have been earned after the date of termination of this Lease until the time of the award exceeds the net amount of rent that could have been reasonably obtained by Landlord using reasonable diligence to relet the Premises; and

(3)     the worth, at the time of the award, of the amount by which the unpaid rent for the balance of the Lease term (as extended), if applicable) after the time of the award exceeds the net amount of rent that reasonably could have been obtained by Landlord using reasonable diligence to relet the Premises; and

(4)     any other amount and court costs necessary to compensate Landlord for all detriment directly caused by Tenant's failure to perform its obligations under this Lease.

Any such payment shall constitute liquidated damages to Landlord, Landlord and Tenant acknowledging and agreeing that it is difficult to determine the actual damages Landlord would suffer by virtue of an event of default and that the agreed-upon liquidated damages are not punitive or a penalty and are just, fair, and reasonable, all in accordance with O.C.G.A. sec. 13-6-7.

The following words and phrases as used above in this Paragraph 22.A. shall have the following meanings:

(i)     the "worth at the time of the award" as used in Paragraph 22.A. (1) and (2) shall be computed by allowing interest at the lesser of (A) eight percent (8%) per annum or (B) the maximum rate permitted by law.

(ii)    the "worth at the time of the award" as used in Paragraph 22.A (3) shall be computed by discounting the amount at the discount rate of six percent (6%) per annum;

(iii)   the term "time of the award" shall mean either the date upon which Tenant pays to Landlord the amount recoverable by Landlord as set forth above or the date of entry of any determination, order, or judgment of any court, whichever first occurs: and

(iv)    the term "net amount of rent" means the gross rent payable under a lease reletting the Premises on market terms for the remaining Term of this Lease from and after the time of the award, less the amortized portion (such amortization being on a straightline basis over the term of the subject lease) attributable to the remaining Term of this Lease from and after the time of the award of brokerage commissions and fees, design fees, attorney's fees, improvement allowances, rent concessions, improvement costs, and other economic concessions and costs made or incurred in connection with a reletting of the Premises to a third party on market terms.

B.      Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, by force if necessary (to the extent permitted by law), without being liable for prosecution or any claim for damages thereof, and relet the Premises and receive the rent therefore; and Tenant agrees to pay to the Landlord on demand any deficiency that may arise by reason of such reletting.  In the event Landlord is successful in reletting the Premises at a rent in excess of that agreed to be paid by Tenant pursuant to the terms of this Lease, Landlord and Tenant each mutually agree that Tenant shall not be entitled, under any circumstances, to such excess rent, and Tenant does hereby specifically waive any claim to such excess rent.

C.      Enter upon the Premises, by force if necessary (to the extent permitted by law), without being liable for prosecution or any claim for damages therefore, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to the Tenant from such action, whether caused by the negligence of Landlord or otherwise.

D.      Landlord shall have all other rights and remedies provided by law or in equity.

In the event Tenant fails to pay any installment of rent hereunder within five (5) days after such installment is due, to help defray the additional cost to Landlord for processing such late payments, Tenant shall pay to Landlord a late charge in an amount equal to five percent (5%) of such installment; and the failure to pay such amount within ten (10) days shall be an event of default hereunder.  The provision for such late charge shall be in addition to all Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or any damages accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained.  Notwithstanding the foregoing, if Landlord elects to terminate this Lease pursuant to Paragraph 22.A. hereof, Landlord's remedies thereunder constituting liquidated damages shall be Landlord's exclusive remedies hereunder respecting Landlord's breach of contract damages resulting from the termination of this Lease.  No act or thing done by the Landlord or its agents

during the Demised Term shall be deemed a termination of this Lease or an acceptance of the surrender of the Premises, and no agreement to terminate this Lease or accept a surrender of the Premises shall be valid unless in writing signed by Landlord.  No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained.  Landlord's acceptance of the payment of rent or other payments hereunder after the occurrence of an event of default shall not be construed as a waiver of such default, unless Landlord so notifies Tenant in writing.  Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of such default or of Landlord's right to enforce any such remedies with respect to such default or any subsequent default.  If, on account of any breach or default by Tenant in Tenant's obligations under the terms and conditions of this Lease, it shall become necessary or appropriate for Landlord to employ or consult with an attorney concerning or to enforce or defend any of Landlord's rights or remedies hereunder, Tenant agrees to pay any reasonable attorney's fees so incurred.

Tenant agrees to indemnify and hold Landlord harmless from any and all losses, costs, expenses (including, without limitation, attorney's fees), liabilities, causes of action, suits, claims, and damages arising out of, or in connection with any violation or breach of, or failure of Tenant to fully and completely observe, satisfy, perform and comply with, the terms and conditions of this Lease.

23.     LANDLORD'S LIEN.     In addition to any statutory lien for rent in landlord's favor, Landlord shall have and Tenant hereby provides to Landlord a continuing security interest for all rents and others sums of money becoming due hereunder from Tenant, upon all goods, wares, equipment, fixtures, furniture, inventory, accounts, contract rights, chattel paper and other personal property of Tenant situated on the Premises, and such property shall not be removed therefrom without the consent of Landlord until all arrearage in rent as well as any and all other sums of money then due to Landlord under this Lease shall first have been paid and discharged.  In the event of a default under this Lease, Landlord shall have, in addition to any other remedies provided herein or by law, all rights and remedies under the Uniform Commercial Code, including without limitation, the right to sell the property described in this Paragraph 23 at public or private sale upon five (5) days notice to Tenant.  This Lease shall also constitute a security agreement.  Tenant hereby agrees to execute such financing statements and other instruments necessary or desirable in Landlord's discretion to perfect and continue the security interest hereby created.  Any statutory lien for rent is not hereby waived, the excess contractual lien herein granted being in addition and supplementary thereto.

24.     MORTGAGES, GROUND LEASES, AND ESTOPPEL CERTIFICATES.

A.     Tenant hereby agrees and accepts that this Lease is and shall be subject and subordinate to any mortgage(s) and/or deeds to secure debt (collectively referred to as the "Mortgage") now or any time hereafter constituting a lien or charge upon the Premises or the improvements situated thereon; provided, however, that if the holder of any such Mortgage elects to have Tenant's interest in this Lease superior to any such instrument, then by notice to Tenant from such holder, this Lease shall be deemed superior to such lien, whether this Lease was executed before or after said Mortgage. If the holder of the Mortgage or any successor in interest shall succeed to the rights of Landlord under this Lease through a foreclosure sale or a sale in lieu of foreclosure, Tenant will attorn to and recognize such successor-landlord as Tenant's landlord and such successor-landlord shall accept such attornment and recognize Tenant's rights of possession and use of the Premises in accordance with the provisions of this Lease. At the request of any holder of a Mortgage, Tenant, Landlord and such holder shall enter into a subordination, non-disturbance and attornment agreement reasonably acceptable to Landlord, Tenant and such holder, but in any event substantially consistent with the terms of this Lease.  Tenant shall at any time hereafter on demand execute any instruments, releases or other documents which may be required by the holder of the Mortgage for the purpose of subjecting and subordinating this Lease to the lien of any such Mortgage.

If, in connection with obtaining financing or refinancing for the Premises, or a sale of the Premises, any lender or purchaser shall request reasonable modifications in this Lease as a condition to such financing or purchase, Tenant will not unreasonably withhold or delay or defer its consent thereto, provided that such modifications do not increase the obligations of Tenant hereunder or materially and adversely affect Tenant's rights hereunder.

B.      Tenant hereby further agrees and accepts that this Lease is and shall be subject and subordinate to any ground lease now or at any time hereafter affecting the Premises.  Tenant shall at any time hereafter on demand execute any instruments, releases or other documents which may be required by the ground lessor of any ground lease affecting the Premises for the purpose of subjecting and subordinating this Lease to any such ground lease.

In the event any ground lessor of a ground lease affecting the Premises requests reasonable modifications in this Lease, Tenant will not unreasonably withhold or delay or defer its consent thereto, provided that such modifications do not increase the obligations of Tenant hereunder or materially and adversely affect Tenant's rights hereunder.

C.      At any time and from time to time designated by Landlord, Tenant will execute, acknowledge and deliver to Landlord, within ten (10) days after receipt of a request from Landlord, a certificate certifying (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the date and nature of each modification), (b) the date, if any, to which rent and other sums payable hereunder have been paid, (c) that no notice has been received by Tenant of any default which has not been cured, except as to defaults specified in said certificate, (d) the unexpired Term of this Lease; and (e) such other matters as may be requested by Landlord.  Any such certificate may be relied upon by any existing or prospective purchaser, investor, ground lessor, mortgagee or holder of any deed to secure debt on the Building or any part thereof.  It is understood and agreed that Tenant's obligation to furnish such estoppel certificates in a timely fashion is a material inducement for Landlord's execution of this Lease.

25.     MECHANIC'S LIENS.    Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatever upon or in any matter to bind, the interest of Landlord in the Premises or to charge the rent payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs and each such claim shall affect and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this instrument.  Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Premises or the improvements thereon and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the right, title and interest of the Landlord in the Premises or under the terms of the lease.

26.     NOTICES.       Any notice, demands, payments or other communications required or permitted to be delivered under this Lease shall be given by personal delivery, by deposit with a courier service that provides next-business-day service, or by deposit in the United States Mail, postage prepaid, Certified or Registered Mail, addressed to the parties hereto at the respective addresses set out below, or at such other address as they have theretofore specified by written notice delivered in accordance herewith:

<table>
<tr><td>LANDLORD:</td><td>TENANT:</td></tr>
<tr><td>McDonald Georgia Commerce Center 400, LLC</td><td>Jerich USA, Inc.</td></tr>
<tr><td>c/o McDonald Development Company</td><td>One Rockefeller Plaza</td></tr>
<tr><td>3715 Northside Parkway, Bldg 200, Suite 700</td><td>Suite 1401</td></tr>
<tr><td>Atlanta, Georgia 30327</td><td>New York, NY 10020</td></tr>
<tr><td>Attn: John R. McDonald</td><td>Attn: Stephan Schwarzl, CFO</td></tr>
</table>

All notices shall be deemed given upon personal delivery, or upon deposit with a courier service that provides next-business-day service, or deposit in the United States Mail, postage prepaid, Certified or Registered Mail, except as otherwise specifically provided in this Lease and except as to the payments of rent to Landlord which shall be effective upon receipt by Landlord.

If and when included within the term "Landlord", as used in this instrument, there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payments to Landlord; if and when included within the term "Tenant", as used in this instrument, there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address within the continental United States for the receipt of notices and payments to Tenant.  All parties within the terms "Landlord" and "Tenant", respectively, shall be bound by notices given in accordance with the provisions of this Paragraph 26 to the same effect as if each had received such notice.

27.     <u>RESTRICTIVE COVENANTS.</u>     Tenant acknowledges that this Lease shall be subject and subordinate at all times to the Declaration of Easements, recorded, or to be recorded, in Chatham County, Georgia Records, as the same may be amended from time to time (hereinafter referred to as the "Declaration"), which affects the Premises.  Tenant agrees to comply with all of the terms and provisions of the Declaration, and not suffer or cause any act by Tenant or any of its employees, agents or invitees, which would violate the Declaration.

28.     <u>REAL ESTATE BROKER.</u>     Tenant represents and warrants that the Tenant has dealt with no broker, agent or finder in connection with this Lease other than Cushman & Wakefield of Georgia, Inc. ('Broker"), which broker is acting on behalf of Tenant and shall be paid a commission by Landlord pursuant to a separate agreement, and insofar as the Tenant knows, no other brokers, agent or finder negotiated this Lease or is entitled to any commission or fee in connection herewith.  Tenant agrees to indemnify, defend and hold Landlord free and harmless from and against all claims for broker's or agent's commissions or finder's fees by any person claiming to have been retained by Tenant in connection with this transaction, or any other losses, costs, expenses (including, without limitation, attorney's fees), liabilities, damages, causes of actions or suits arising out of the alleged employment or use of a broker, agent or finder by Tenant.

29.     <u>LIMITATIONS ON LANDLORD'S LIABILITY.</u>     LANDLORD'S     LIABILITY     FOR DAMAGES OR BREACH OR NONPERFORMANCE BY LANDLORD, OR ARISING OUT OF THE SUBJECT MATTER OF THIS LEASE OR THE RELATIONSHIP CREATED HEREBY, SHALL BE LIMITED TO, AND COLLECTIBLE ONLY OUT OF, LANDLORD'S INTEREST IN THE PREMISES AND NO PERSONAL LIABILITY IS ASSUMED BY, OR SHALL AT ANY TIME BE ASSERTED AGAINST, LANDLORD OR ITS AFFILIATED CORPORATIONS, ITS AND THEIR PARTNERS, VENTURERS, DIRECTORS, SHAREHOLDERS, OFFICERS, AGENTS, SERVANTS AND EMPLOYEES, OR ANY OF ITS OR THEIR SUCCESSORS OR ASSIGNS; ALL SUCH LIABILITY, IF ANY, BEING EXPRESSLY WAIVED AND RELEASED BY TENANT.  IF LANDLORD, IN VIOLATION OF THE TERMS OF THIS LEASE OR THE PROVISIONS OF LAW, WITHHOLDS, DENIES OR DELAYS ANY CONSENT WHICH TENANT IS REQUIRED TO OBTAIN HEREUNDER, TENANT MAY SEEK SPECIFIC PERFORMANCE BUT SHALL NOT BE ENTITLED TO DAMAGES THEREFORE.  LANDLORD'S REVIEW, SUPERVISION, COMMENTING ON OR APPROVAL OF ANY ASPECT OF WORK TO BE DONE BY OR FOR TENANT IS SOLELY FOR LANDLORD'S PROTECTION AND, EXCEPT AS EXPRESSLY PROVIDED, CREATES NO WARRANTIES OR DUTIES TO TENANT OR TO THIRD PARTIES.  LANDLORD SHALL NOT BE LIABLE IN ANY EVENT FOR INDIRECT, CONSEQUENTIAL, OR SPECULATIVE DAMAGES SUCH AS BUSINESS LOSS.

30.     <u>MISCELLANEOUS.</u>

A.     Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

B.     The terms, provisions and covenants and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon, the parties hereto and upon their respective heirs, legal representatives, successors and permitted assigns, except as otherwise herein expressly provided.  Landlord shall have the right to assign any of its rights and obligations under this Lease.

C.     Tenant agrees to furnish to the Landlord promptly upon demand, a corporate resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization of such Tenant to enter into this Lease.

D.     The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

E.     Time is of the essence of this Lease.

F.     Intentionally deleted.

G.     This Lease may not be altered, changed, or amended except by an instrument in writing signed by both parties hereto.

H.     All obligations of Tenant hereunder not fully performed as of the expiration or earlier termination of the Demised Term shall survive the expiration or earlier termination of the Demised Term, including without limitation, all payment obligations with respect to taxes and insurance and all obligations concerning the condition of the Premises.  Upon the expiration or earlier termination of the Demised Term, and prior to Tenant vacating the Premises, Tenant shall pay to Landlord any amount reasonably estimated by Landlord as necessary to put the Premises, including without limitation, all heating and air conditioning systems and equipment therein, in good condition and repair.  Tenant shall also, prior to vacating the Premises, pay to Landlord the amount, as estimated by Landlord, of Tenant's obligation hereunder for real estate taxes and insurance premiums for the year in which the lease expires or terminates.  All such amounts shall be used and held by Landlord for payment of such obligations of Tenant hereunder, with Tenant being liable for any additional costs therefore upon demand by Landlord, or being liable for any additional costs therefore upon demand by Landlord, or with any excess to be returned to Tenant after all such obligations have been determined and satisfied, as the case may be.  Any security deposit held by Landlord shall be credited against the amount payable by Tenant under this Paragraph 30.H.

I.     If any clause, sentence, paragraph or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the Term of this Lease, then and in that event it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause, sentence, paragraph or provision of this Lease that is illegal, invalid or unenforceable, there be added as a part of this Lease contract a clause, sentence, paragraph or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

J.     Provided Landlord is the prevailing party, Tenant agrees to pay any and all attorneys' fees and expenses Landlord incurs in enforcing any of the obligations of Tenant under this Lease, or in any litigation or negotiation in which Landlord shall, by virtue of this Lease or Landlord's ownership of the Premises, become involved in, through or on account of this Lease.  Provided Tenant is the prevailing party, Landlord agrees to pay any and all attorneys' fees and expenses Tenant incurs in enforcing any of the obligations of Landlord under this Lease.

K.     This Lease shall create the relationship of landlord and tenant between Landlord and Tenant; no estate shall pass out of Landlord; Tenant has only a usufruct, not subject to levy and sale.

L.     Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant, and the recording thereof in violation of this provision shall make this Lease voidable at Landlord's election.

M.     Because the Premises are on the open market and are presently being shown, this Lease shall be treated as an offer with the Premises being subject to prior lease and such offer subject to withdrawal or non-acceptance by Landlord or to other use of the Premises without notice, and this Lease shall not be valid or binding unless and until accepted by Landlord in writing and a fully executed copy delivered to both parties hereto.

N.     All references in this Lease to "the date hereof" or similar references shall be deemed to refer to the last date, in point of time, on which all parties hereto have executed this Lease.

O.      This Lease may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same lease agreement.

P.      Except as specifically provided to the contrary in this Lease, the obligation of Tenant to pay Rent hereunder and perform all of Tenant's covenants and agreements hereunder shall not be impaired nor shall Landlord be in default hereunder because Landlord is unable to fulfill any of its obligations under this Lease, if Landlord is prevented or delayed from so doing by any of the following (which shall be referred to herein as a "Force Majeure"):  fire, flood, extreme weather, labor disputes, strike, lock-out, riot, governmental permitting, unusual delay in deliveries or unavailability of materials, unavoidable casualties, Act of God , any accident not caused by Landlord, breakage of any component of the Premises or the Building or of any item being installed in the Premises or the Building, repairs, alterations, or improvements to the Premises or the Building, strike or labor troubles, or any other cause whatsoever beyond the reasonable control of Landlord, including, but not limited to, energy shortages or governmental preemption in connection with a national emergency, or by reason of government laws or any rule, order or regulation of any department or subdivision thereof of any governmental agency, or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.  [Tenant will not be in default of any obligation hereunder if Tenant is prevented or delayed from doing so by any Force Majeure.]

Q.      Upon request of Landlord, Tenant agrees to furnish to Landlord copies of Tenant's financial statements, audited if available, consisting of a most recent year end and current month end balance sheet, statement of cash flows, income statement and all relevant notes or summaries, reasonably acceptable to Landlord. Landlord shall not release copies of the financial statements or otherwise disclose or communicate the contents thereof to any other party or entity; provided, however, Landlord may disclose the financial statements to any prospective or existing mortgagee or purchaser of or investor in the Building and Landlord's attorneys, agents and accountants and as otherwise required by law.

R.      Landlord and Tenant each hereby covenant and agree that this lease, including the exhibits hereto, sets forth all of the promises, covenants, agreements, conditions and understandings between them with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings relating to such subject matter except as otherwise set forth herein.  In entering into this lease, neither party has relied upon any representation, warranty, covenant or other inducement not expressly set forth in this lease.

31.      <u>RENEWAL OPTION</u>.  Provided an event of default by Tenant has not occurred, Tenant is hereby granted the option to renew the term of this Lease for two (2) consecutive periods of three (3) years (each period being called a "Renewal Term") in addition to the initial Demised Term.  Such options shall be exercised by giving Landlord written notice thereof no later than one hundred eighty (180) days prior to the date on which the term would otherwise expire.  All of the terms, covenants, conditions, and provisions hereof, except for this Paragraph 31, shall remain in full force and effect during each Renewal Term.  At commencement of the first Renewal Term, Base Rent payable under Paragraph 3 hereof shall increase by two and one quarter percent (2.25%) over the then-current Base Rent in effect at the expiration of the current Demised Term, which escalated Base Rent shall remain in effect for the next twelve (12) consecutive months and shall increase by two and one quarter percent (2.25%) each twelve (12) months thereafter for the balance of the first Renewal Term. At commencement of the second Renewal Term, Base Rent shall be at the then-current market rate, which market rate shall not be less than the Base Rent paid in the last year of the first Renewal Term, and thereafter, Base Rent shall increase by two and one quarter (2.25%) each twelve (12) months for the balance of the second Renewal Term.

32.      <u>TERMINATION OPTION</u>.  Provided an event of default by Tenant has not occurred, Tenant shall have the right to cancel this Lease as follows:  i) effective as of the end of fortieth (40th) month of the Demised Term (the "First Effective Date") with one hundred eighty (180) days written notice to Landlord prior to the First Effective Date together with payment to Landlord of One Hundred Forty-Seven Thousand Eight Hundred Forty-Eight and 57/100 Dollars ($147,848.57); or ii) effective as of the end of the seventy-fourth (74th) month of the Demised Term (the "Second Effective Date") with one hundred eighty (180) days written notice to Landlord prior to the Second Effective Date plus payment to Landlord of Nine Thousand Three Hundred Seventeen and 38/100 Dollars ($9,317.38); time being of the essence.

32.     RIGHT OF FIRST REFUSAL. Provided an event of default by Tenant has not occurred, Tenant shall have a one-time Right of First Refusal on the adjacent space (the "First Right Space") as shown on Exhibit "B", should it become available for lease during the initial Demised Term of the Lease. Should Landlord receive a bona fide offer during the Demised Term or any Renewal Term of the Lease from a third party to lease the First Right Space, Landlord shall send to Tenant a copy of the proposed lease terms offered by the third party (the "Proposal"). Tenant shall have a period of five (5) business days after receipt of the Proposal from Landlord during which Tenant may elect in writing to Landlord, to lease the First Right Space on the same terms as the Proposal.  Upon expiration of the five (5) business day period, Tenant's Right of First Refusal hereunder shall terminate, and Landlord may enter into the third party lease transaction.  Tenant shall have no further Right of First Refusal under the Demised Term or any Renewal Term.

33.     BENEFICIAL OCCUPANY.  Subject to Landlord's construction schedule, Tenant will be allowed access to the Premises fifteen (15) days prior to the Commencement Date for the purposes of installing furniture, fixtures, and equipment.  Tenant will coordinate with Landlord's project manager, so that installation of Tenant's work does not interfere with Landlord's construction schedule or delay substantial completion.

34.     RENT ABATEMENT.  Landlord agrees that, provided Tenant is not in default under the Lease, monthly Base Rent under Paragraph 3 of the Lease shall be abated by fifty percent (50%) during months two (2) through seven (7), month sixteen (16) and month thirty-nine (39) of the Demised Term.  In the event Tenant defaults in its obligations under the Lease, all rent that has been abated hereunder shall be immediately due and payable.

35.     RAIL SERVICE. Tenant acknowledges that CSX Railroad ("CSX") services the existing rail siding at the rear of the Building (the "Rail Siding"). So long as this Lease remains in effect and Tenant is entitled to possession of the Premises, Landlord agrees that Tenant shall have the non-exclusive right to use seven (7) of the nine (9) rail car positions on the Rail Siding for its operations, as such Rail Siding is shown on the enclosed Exhibit 'B'. Tenant shall not be permitted to store product on the Rail Siding. It shall be Tenant's responsibility to obtain a service agreement with CSX with respect to use of the Rail Siding, to pay to CSX all charges associated with Tenant's use of the Rail Siding, and to coordinate use of the Rail Siding and dock with and among CSX, Tenant and other tenants in the Building. Landlord is not responsible for and shall not be responsible for, or required to participate in, such coordination efforts.  Landlord makes no representations concerning the Rail Siding, the use or convenience of use of the Rail Siding, or the suitability of the Rail Siding for use in Tenant's operations, and Tenant accepts the Rail Siding in its current "As-Is" condition with all faults.  Tenant acknowledges that the use of a Rail Siding will be on a first-come, first-served basis, and that CSX, and not Landlord, Tenant or other Building tenants, shall control and determine the following: (i) the dates or times of delivery of rail cars to the Rail Siding, (ii) the order or position of rail cars delivered to the Rail Siding, (iii) the positioning of rail cars other than those serving Tenant and those serving other tenants of the Building on the Rail Siding, (iv) the removal and/or timing of removal of rail cars from the Rail Siding; and (v) generally, all other aspects of rail car service to the Rail Siding. Tenant acknowledges and agrees that Tenant and other tenants of the Building shall have the right to access the Rail Siding along the gravel drive that runs from the small parking lot around the corner of the Building to the Rail Siding as depicted on Exhibit 'B' via forklift or in other reasonable manners in order to deliver product to or remove product from rail cars located on the Rail Siding.  Tenant shall have no claim against Landlord with respect to, and Landlord shall have no liability or obligation to Tenant with respect to, the Rail Siding, the use of the Rail Siding, Tenant's product or property located on the Rail Siding and/or in rail cars wherever located, except as expressly set forth in, and subject to, the terms, covenants, conditions and limitations of this Section 35.

36.     CAR AND TRAILER PARKING.  So long as this Lease remains in effect and Tenant is entitled to possession of the Premises, Landlord will provide Tenant with twenty (20) unassigned, nonexclusive parking spaces at no charge.  Additionally, Tenant shall have exclusive use of twenty-two (22) trailer parking spaces as shown on the enclosed Exhibit 'B'.

*Signatures are on the following page*

IN WITNESS WHEREOF, the parties have executed this Lease with intent to be bound hereby as of the day and year indicated above each signature block, respectively, but effective as of the day and year first above written.

EXECUTED BY LANDLORD, this ⎯⎯ day of ⎯⎯⎯⎯⎯⎯⎯ , 2014.

LANDLORD

McDonald Georgia Commerce Center 400, LLC, a
Georgia limited liability company

By: McDonald Ventures XXIV, LLC, a
    Georgia limited liability company, its Manager

By: McDonald Industrial XXIV, LLC, a
    Georgia limited liability company, its Manager

By: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    John R. McDonald, Manager

EXECUTED BY TENANT, this ⎯⎯ day of ⎯⎯⎯⎯⎯⎯⎯ , 2014.

TENANT

Jerich USA, Inc., a New Jersey corporation

By: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Title: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Exhibit A

## **Legal Description**

ALL THAT CERTAIN LOT, TRACT, OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE SEVENTH G.M. DISTRICT, CITY OF SAVANNAH, CHATHAM COUNTY, GEORGIA AND KNOWN AS TRACT "A", BEING ALL OF LOT 16, PORTIONS OF LOTS 1, 2, 3, 15 & 17, PORTIONS OF 20 FOOT ROADS, AND PORTIONS OF LANDS FORMERLY OF UNION STATION COMPANY, PARCEL "B", SABINE FIELDS PLANTATION, BEING LANDS OF MCDONALD VENTURES XXIV, LLC, CONTAINING 25.36 ACRES, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT A 5/8" IRON PIN AT THE POINT OF INTERSECTION OF THE SOUTHERN RIGHT OF WAY LINE OF TELFAIR ROAD AND THE WESTERN RIGHT OF WAY LINE OF GWINNETT STREET, SAID POINT BEING LOCATED AT GEORGIA STATE PLANE GRID COORDINATES (EAST ZONE – NAD '83), N = 758,918.185, E = 974,411.390: THENCE EXTEND SOUTH 59 DEGREES 22 MINUTES 38 SECONDS WEST, ALONG THE SOUTHERN RIGHT OF WAY LINE OF TELFAIR ROAD, A DISTANCE OF 1486.19 FEET TO A POINT MARKED BY A 5/8" IRON PIN, WHICH POINT IS THE POINT OF BEGINNING OF THE HEREINAFTER DESCRIBED PROPERTY; THENCE EXTEND SOUTH 30 DEGREES 42 MINUTES 22 SECONDS EAST, A DISTANCE OF 617.91 FEET TO A POINT; THENCE EXTEND SOUTH 04 DEGREES 19 MINUTES 13 SECONDS WEST, A DISTANCE OF 94.62 FEET TO A POINT; THENCE EXTEND SOUTH 32 DEGREES 29 MINUTES 59 SECONDS EAST, A DISTANCE OF 58.70 FEET TO A POINT; THENCE EXTEND SOUTH 57 DEGREES 30 MINUTES 01 SECONDS WEST, A DISTANCE OF 82.78 FEET TO A POINT; THENCE EXTEND SOUTH 34 DEGREES 18 MINUTES 28 SECONDS EAST, A DISTANCE OF 286.72 FEET TO A POINT; THENCE EXTEND SOUTH 27 DEGREES 16 MINUTES 01 SECONDS EAST, A DISTANCE OF 292.34 FEET TO A POINT; THENCE EXTEND SOUTH 32 DEGREES 30 MINUTES 44 SECONDS EAST, A DISTANCE OF 396.28 FEET TO A POINT ON THE SOUTHERN LINE OF A 100 FOOT GEORGIA CENTRAL RAILROAD RIGHT OF WAY, WHICH POINT IS LOCATED 50 FEET NORTH OF THE CENTERLINE OF THE TRACK; THENCE EXTEND ALONG SAID NORTH RIGHT OF WAY LINE, BEING A LINE 50 FEET NORTH OF AND PARALLEL TO THE CENTERLINE OF THE RAILROAD TRACK, SOUTH 57 DEGREES 29 MINUTES 16 SECONDS WEST, A DISTANCE OF 691.35 FEET TO A POINT MARKED A 5/8" IRON PIN ON THE EAST LINE OF A 150 FOOT CSX RAILROAD MAIN LINE RIGHT OF WAY, WHICH POINT IS LOCATED 75 FEET EAST OF THE SOUTHBOUND MAIN LINE TRACK; THENCE EXTEND NORTH 32 DEGREES 29 MINUTES 59 SECONDS WEST, ALONG THE EAST LINE OF SAID 150 FOOT CSX RAILROAD MAIN LINE RIGHT OF WAY, BEING A LINE 75 FEET EAST OF AND PARALLEL TO THE CENTERLINE OF THE SOUTHBOUND MAIN LINE TRACK, A DISTANCE OF 1,753.96 FEET TO A POINT MARKED BY A 5/8" IRON PIN ON THE SOUTH RIGHT OF WAY LINE OF TELFAIR ROAD; THENCE EXTEND, NORTH 59 DEGREES 22 MINUTES 38 SECONDS EAST, ALONG THE SOUTH RIGHT OF WAY LINE OF TELFAIR ROAD, A DISTANCE OF 449.25 FEET TO A POINT MARKED BY A 5/8" IRON PIN; THENCE EXTEND SOUTH 31 DEGREES 56 MINUTES 37 SECONDS EAST, A DISTANCE OF 642.08 FEET TO A POINT MARKED BY A 5/8" IRON PIN ON THE CENTERLINE OF A 100 FOOT SAVANNAH ELECTRIC AND POWER COMPANY EASEMENT; THENCE EXTEND NORTH 48 DEGREES 08 MINUTES 24 SECONDS EAST ALONG THE CENTERLINE OF SAID 100 FOOT EASEMENT A DISTANCE OF 351.98 FEET TO AN POINT MARKED BY A 5/8" IRON PIN; THENCE EXTEND NORTH 30 DEGREES 42 MINUTES 22 SECONDS WEST, A DISTANCE OF 573.32 FEET TO A POINT MARKED BY A 5/8" IRON PIN ON THE SOUTH RIGHT OF WAY LINE OF TELFAIR ROAD; THENCE EXTEND NORTH 59 DEGREES 22 MINUTES 38 SECONDS EAST, ALONG SAID SOUTH RIGHT OF WAY LINE A DISTANCE OF 39.71 FEET TO THE POINT OF BEGINNING.

Exhibit B



GEORGIA COMMERCE CENTER II
BUILDING 400 - 279,126 SF

320 Telfair Road
Savannah, Georgia 31415